UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Recarlos C.,[1] | ) | C/A No. 5:22-3914-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Martin O'Malley,[2] Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties' submissions and the applicable law, the court reverses and remands the Commissioner's decision for the reasons discussed herein.

I.   Relevant Background

   A.   Procedural History

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Martin O'Malley was confirmed as Social Security Commissioner on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Martin O'Malley for Kilolo Kijakazi as Defendant in this action.

Plaintiff protectively applied for DIB on February 7, 2020, and for SSI on January 21, 2020[3] under Title II and Title XVI of the Act. Tr. 228, 237. Plaintiff alleged a disability onset date of September 4, 2015. Tr. 228, 235.[4] Plaintiff's applications were denied initially, Tr. 109-10, and upon reconsideration, Tr. 142-43, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 169-70. The administrative hearing was held on January 6, 2022, before ALJ Linda Diane Taylor, Tr. 30-51; on February 16, 2022, the ALJ issued an unfavorable decision, finding Plaintiff not disabled within the meaning of the Act, Tr. 12-29. Plaintiff requested review of the ALJ's decision, Tr. 224-27. On September 15, 2022, the Appeals Council denied Plaintiff's request for review, Tr. 1-6, thereby making the ALJ's decision the final decision of the Commissioner, Tr. 1. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on November 7, 2022. ECF No. 1.

B.    Plaintiff's Background

Born in July 1980, Plaintiff was 35 years old as of his original alleged onset date of September 4, 2015. Tr. 228. In his February 7, 2020 form Disability Report-Adult, Plaintiff indicated he completed the 12th grade, did not attend special education classes, and had not completed any type of specialized job training, trade or vocational school. Tr. 264. He noted his past relevant work ("PRW") was as a sales person in the furniture business, a position he held from November 2007 through September 2015. Tr. 264. Plaintiff indicated that job included the use of machines, tools, or equipment and included writing. Tr. 265. He estimated he had to walk and stand for 5 hours in a work-day, sit and reach for 1 hour; climb and write/handle small objects for 2 hours, and reach for 1 hour. Tr. 265. Plaintiff said he lifted 10 pounds frequently and at times

---

[3] Although the Application Summaries are dated February 7, 2020, as noted in the Disability Determination and Transmittal, Plaintiff's protected filing date for his SSI application is January 21, 2020. Tr. 110.

[4] Plaintiff later amended the alleged onset date to December 1, 2018. Tr. 15.

had to lift 50 pounds. Tr. 265. Plaintiff said he stopped working on November 27, 2015 because of his medical conditions, which he listed as "left hip, right arm, neck, insomnia, and bronchitis." Tr. 261. Plaintiff indicated that he is 6' tall, weighed 191 pounds, and his conditions caused pain or other symptoms. *Id.*

In a "Mobility Questionnaire" signed April 3, 2020, he described his pain as follows:

My pain is very unbearable, pain is isolated in neck, lower back, hip, and right hand pain does go up my spine. Sitting and standing brings on the pain. Nothing helps the pain and it [has] been this way for a while now. Going to physical therapy makes the pain worse. For more than a[n] hour the pain comes from sitting and standing.

Tr. 284. Plaintiff lists his medications. He explains his daily activities as follows: "I'm able to drive short distance, able to try to fix light breakfast (cereal, toast, juice)." Tr. 284. Plaintiff indicated he had problems walking but did not require an assistive device. Tr. 285. He said he could brush his hair and teeth, but had difficulty with buttons. Tr. 285. He said he could lift approximately 5 pounds, and he could lift a gallon of milk. Tr. 285.

In a Disability Report-Appeal dated June 8, 2020, Plaintiff indicated that around April 2020 his medical conditions changed in that his "back issues got worse. Started doing injections." Tr. 288. He indicated he did not have any new medical issues to report. Tr. 288. His responses to the questions about his ability to walk and his ability to handle things was about the same as his responses in April 2020. Tr. 299.

In a second Mobility Questionnaire, completed August 15, 2020, Plaintiff again described severe pain in his "lower back, upper neck, left hip, and right arm." Tr. 298. He indicated he was in too much pain to do activities, but he was sometimes able to bathe and dress himself. Tr. 298. He said his girlfriend went shopping for him, and he could drive short distances if not in pain. Tr. 298.

3

In a subsequent Disability Report-Appeal dated September 24, 2020, Plaintiff indicated that, as of September of that year his medical conditions had changed in that he "started getting steroid injections in [his] back where they have to put [him] to sleep to give them to [him]." Tr. 304. Plaintiff indicated he had no new conditions to report, Tr. 304, nor were there changes in his activities, Tr. 307.

C.    The Administrative Proceedings

Plaintiff appeared, along with his attorney, for his administrative hearing on January 6, 2022, in Charleston, South Carolina. Tr. 30. Vocational expert ("VE") Michael DeMark also appeared. *Id.* Due to the extraordinary circumstances of the coronavirus pandemic the hearing was conducted telephonically. Tr. 32. After brief discussion regarding medical records and a short opening statement from counsel Plaintiff was sworn in as a witness. Tr. 32-34.

1.    Plaintiff's Testimony

In response to questions from the ALJ Plaintiff indicated he was 41 years old, had a driver's license, but had not driven a car in about three years. Tr. 35. Plaintiff said when he needed to go somewhere either his wife or medical transport would take him. Tr. 35. Plaintiff said he lived at home with his wife and their three-year-old daughter. Tr. 35-36. Plaintiff's wife does not work outside the home. Tr. 35.

Plaintiff indicated he had completed the 12th grade. He said he was no longer working and believes he last worked in around 2015. Tr. 36. Plaintiff said that from 2008 through 2015 he worked in furniture sales at Farmer's Furniture. Tr. 36.

In response to the ALJ's question about why he believed himself disabled and unable to work, Plaintiff responded as follows:

> Because I have migraines between, I guess seven days out the week, I have them
> between four, four times out the week. [I] have a lower back problem; I have a neck
> problem, hip replacement problem; I can't stand more than between 15 and 30

4

minutes; I'm on some heavy medication; I don't sleep more than three hours during the day.

Tr. 37. The ALJ then asked Plaintiff questions about his medical conditions.

Regarding his lower back, Plaintiff said he had received injections since 2018, with his last injection having been in April 2021. Tr. 36-37. He indicated the injections gave him bad muscle spasms. Tr. 37. Plaintiff also indicated he had tried physical therapy, but it made it worse, so he did not continue to do the exercises. Tr. 37-38. Plaintiff said he now is taking oxycodone 10 milligrams every four-to-six hours for the pain. Tr. 38. He said he took the medication around four days out of the week. The doctor has not changed his pain medications in the past year. Tr. 38. Plaintiff said he believed he would be able to sit or stand between 15 and 30 minutes at a time and walk about five minutes unless his hip started bothering him. Tr. 38-39.

Regarding his neck, Plaintiff indicated he had neck surgery. Post-surgery, though, Plaintiff indicated that he still has pain. Tr. 39. Plaintiff said the neck pain was causing migraines and they were trying to figure out why he had the migraines. He then said he was getting the migraines from neck surgery and the right side of his face was numb. Tr. 39. Plaintiff indicated he was getting physical therapy for his neck, but it was stopped because it made the pain worse. Plaintiff also said they had stopped doing injections in his neck. Tr. 39. Plaintiff said there were no stretching exercises he could do for his neck because it "really hurt[]." Tr. 39.

Regarding Plaintiff's left hip, he acknowledged it had been replaced. Tr. 39-40. When asked how it was doing since that surgery, Plaintiff responded, "[n]ot good." Tr. 40. Plaintiff explained that if he sat too long his hip would "go out"; if he stood too long he would have pain that went down to his feet and made them numb. Tr. 40. Plaintiff said the pain would sometimes then come back up into his back. Plaintiff said they had tried therapy but it did not help and made

the pain worse. Tr. 40. Plaintiff said he wanted to try injections but insurance would not cover them. Tr. 40.

Plaintiff indicated he was right-handed, and he had had surgery on his right hand. Tr. 40. Plaintiff said the right hand was not doing well and he was dropping things more frequently. He also indicated it was not sensitive to heat, causing him to burn his hand in the kitchen. Tr. 40.

Plaintiff indicated that his entire right side would go numb while he was sleeping. Tr. 40-41. He said he slept in a recliner because of pain; he usually slept about three hours. Tr. 41.

Plaintiff said he was taking a medication that starts with an "s" for headaches; he did not recall the name of the drug. Tr. 41. He noted that medication had not been changed in the past year. Tr. 41. When asked what he believed triggered his headaches, Plaintiff said, "I believe that's from my neck and not getting enough sleep." Tr. 41.

The ALJ asked Plaintiff to describe how he usually spent his days. Plaintiff indicated it would depend on his pain-level when he awakened and whether he had gone to sleep at all. Tr. 41-42. Once Plaintiff is up in the morning, he says washes off or has his wife help wash and dress him. Tr. 42. He said that, otherwise, he does not do anything else except go back and forth to doctor's appointments. Tr. 42. Plaintiff said he watched television, sometimes watching movies and football. He does not use the internet other than to determine information about a doctor's appointment. Tr. 42. Plaintiff said he would typically watch TV for about an hour or two if he did not fall asleep. Tr. 42-43. Plaintiff indicated he did not do anything else; however, he noted he would sit with his daughter and let her talk to and read to him when she wanted to do so. Tr. 43.

The ALJ turned the questioning over to Plaintiff's counsel. In response to counsel's questions, Plaintiff indicated he had carpal tunnel in his right hand and still had symptoms from that, including numbness and dropping things about every day. Tr. 43.

Plaintiff said he slept in the recliner at night; he stayed in the recliner some during the day but sometimes moved over to the love seat. Tr. 44. He indicated he spent most of the daylight hours sitting in the recliner or the love seat. Tr. 44.

When asked if he had anything to add to his testimony, Plaintiff indicated that the pain medicine shots caused him to be unable to do anything for three or four days. In addition, the pain medicine makes him sleepy. Tr. 45. He also indicated the medicine and/or the pain made it difficult for him to focus and concentrate during the day. Tr. 45. Plaintiff clarified that it was not his decision to discontinue physical therapy. Tr. 45. Rather, it was discontinued because it made the pain worse. Tr. 45.

It was noted that Plaintiff's alleged onset date was being changed to December 1, 2018. Tr. 46.

### 2.    VE's Testimony

VE DeMark testified at Plaintiff's administrative hearing. He described Plaintiff's PRW as furniture salesperson, Dictionary of Occupational Titles ("DOT") Code 270.357-030, specific vocational preparation ("SVP") of 4, light-exertion level. Tr. 47.

The ALJ asked the VE to consider a person of Plaintiff's age, education, and experience, who would be able to perform the full range of light exertion with the following further limitations:

> Frequently climbing stairs and ramps; never climbing ladders, ropes, or scaffolds; frequently crouching and kneeling; occasionally stooping and crawling; frequently handling and fingering with the right dominant hand; frequently reaching overhead with the bilateral upper extremities; avoiding concentrated exposure to hazards[.]

Tr. 47. The ALJ asked if the hypothetical individual could perform Plaintiff's past work. The VE responded that he would. Tr. 47. In response to the ALJ's query the VE also identified other jobs that the hypothetical person could perform: router, DOT Code 222.587-038, SVP 2, light exertion, approximately 31,000 jobs nationally; cashier II, DOT Code 211.462.010, SVP 2, light exertion,

approximately 534,000 jobs nationally; and housekeeping/cleaner, DOT Code 323.687-014, SVP 2, light exertion, approximately 193,000 jobs nationally. Tr. 49.

For his second hypothetical, the ALJ asked the VE to assume the same individual and limitations as the first, except the exertion level would be sedentary. Tr. 49. The VE testified this individual would not be able to do Plaintiff's PRW. However, there would be jobs in the national economy that the hypothetical person could perform: addresser, DOT Code 209.587-010, SVP of 2, sedentary, approximately 2000 jobs nationally; document preparer, DOT Code 249.587-018, SVP 2, sedentary, approximately 16,000 jobs nationally; and eyeglass frame polisher, DOT Code 713.684-038, SVP 2, sedentary, approximately 1000 jobs nationally. Tr. 49-50.

For the third hypothetical, the ALJ asked the VE to make the same assumptions as hypothetical number two except to add that such individual would be off task greater than 20% scheduled duty time in addition to normal breaks on a consistent basis. Tr. 50. The VE opined there would be no available jobs for such an individual, noting his opinion that employers typically tolerate 10% time-off-task in addition to normal breaks but anything more would be work-preclusive. Tr. 50.

The VE said his testimony was consistent with the DOT and companion publications except the information about time-off-task and reaching overhead bilaterally (versus reaching in all directions) is not covered in those publications. Tr. 50. Further, the VE indicated the DOT did not differentiate climbing ramps and stairs versus ladders, ropes, and scaffolds. The VE said his opinion as to these matters was based on his experience in job placement and job analysis. Tr. 50.

Plaintiff's counsel asked the VE how monthly absenteeism would be tolerated. The VE responded that, at the unskilled level, he was of the opinion that employers would tolerate one only absence per month. Tr. 51.

With no other further questions, the hearing closed. Tr. 51.

## II. Discussion

### A.    The ALJ's Findings

In her February 16, 2022 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2.    The claimant has not engaged in substantial gainful activity since December 1, 2018, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, status post left hip replacement, status post right hand surgery, status post right carpal tunnel release (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) and further limited by the following: frequently climbing stairs and ramps; never climbing ladders, ropes or scaffolds; frequently crouching and kneeling; occasionally stooping and crawling; frequently handling and fingering with the right dominant hand; frequently reaching overhead with the bilateral upper extremities; avoiding concentrated exposure to hazards.

6.    The claimant is capable of performing past relevant work as a furniture salesman. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined, the Social Security Act, from December 1, 2018, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. 17-18, 21-22.

### B.  Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if the claimant can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing the inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish the inability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146 n.5 (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*; *Richardson v. Perales*, 402 U.S.

389, 390 (1971); *Walls*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

III.    Analysis

Plaintiff first argues the ALJ did not adequately evaluate the impact of his headaches—which he characterizes as symptomatic to his severe impairment of cervical degenerative disc disease—on his ability to function. Separately, Plaintiff argues the ALJ improperly evaluated Plaintiff's subjective complaints of pain and improperly characterized a March 15, 2021 cervical MRI. Pl. Mem. 1, ECF No. 14. The Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff's residual functional capacity ("RFC") findings and her consideration

of Plaintiff's subjective complaints, including consideration of Plaintiff's headaches. Def. Br. 7, ECF No. 16. The Commissioner does not reference the March 2021 MRI or the ALJ's treatment of same.

Both of Plaintiff's allegations of error ultimately relate to the limitations the ALJ imposed on his RFC. Plaintiff first focuses on his allegations concerning headaches, then he focuses more generally on subjective complaints of pain and the ALJ's characterization of certain evidence. The court first considers Plaintiff's headache-related allegation of error.

A.      Headaches

At bottom, Plaintiff's allegation concerning his headaches is that the ALJ erred by failing to adequately consider his allegations concerning headaches and the impact his headaches would have on his ability to perform work-related functions.

1.      The ALJ's findings related to Plaintiff's headaches

The ALJ initially considered Plaintiff's headache-related allegations at Step Two of the sequential process and found as follows:

> The claimant alleges frequent migraines (Testimony). According to treatment records, he does not have migraines, but he "is simply having cervicogenic headache[s]" (Ex. B18F/2). Neurological examinations do not reveal any functional limitations attributable to headaches—he is awake and relates well; cranial nerve functioning is normal; coordination is intact; speech is normal; he is in no distress; mood and affect are normal (Ex. B18F/2-3, 6-7, 10-11). Therefore, the claimant does not have a severe impairment of headaches or migraines.

Tr. 18.

At Step Four, the ALJ set out Plaintiff's RFC, which limited Plaintiff to light work with additional functional limitations. Plaintiff was limited to frequent stair- and ramp-climbing, crouching, kneeling, right-hand handling and fingering, and bilateral overhead reaching. He was to occasionally stoop and crawl. Plaintiff was never to climb ladders, ropes, or scaffolds; he was to avoid concentrated exposure to hazards. Tr. 18-19.

After setting out the relevant regulatory framework, the ALJ spends several pages discussing Plaintiff's alleged disabilities and record evidence regarding same. The ALJ notes Plaintiff has "allege[d] disability due to physical impairments that he claims cause *headaches*, neck pain, hip pain, and numbness in the right hand." Tr. 19 (emphasis added). The ALJ notes Plaintiff testified that "his symptoms limit his abilities to stand more than 20 minutes, walk more than five minutes, sit more than 30 minutes, and handle objects (Testimony)." Tr. 19. The ALJ then sets out some medical evidence, none of which relates to Plaintiff's alleged headaches. The ALJ concludes the RFC section of her decision by considering and distinguishing RFC limitations imposed by a prior ALJ as to a prior period. Tr. 21. The prior ALJ decision had limited Plaintiff to "occasional operation of a motor vehicle and no work at unprotected heights." Tr. 21. In explaining his differing limitation as to hazards, the ALJ found: "Considering cervicogenic headaches and use of narcotics, however, the claimant should avoid concentrated exposure to hazards." Tr. 21.

   2. Record evidence concerning Plaintiff's allegations of headaches

For the most part, Plaintiff's visits to his pain management providers focused on issues other than headaches. However, these records include some discussion of headache-related complaints.

On February 17, 2021, Plaintiff reported to his pain management doctor, John Tomarchio, M.D., that he was experiencing "right sided neck pain radiating as HA [headache] over the top of the right side of his head." Tr. 626. Dr. Tomarchio assessed cervicogenic headache. Tr. 626. Plaintiff's prescriptions remained the same; he also ordered a lumbar transforaminal injection. Tr. 627.

Plaintiff continued medication management with Dr. Tomarchio for his cervical spine and lumbar spine pain. *See* Tr. 605, 607, 609, 614, 617 (Mar. 17, 2021, Apr. 14, 2021, May 11, 2021,

June 8, 2021).[6] In June 2021, Dr. Tomarchio noted Plaintiff "still has severe neck pain with bilateral radiculopathy to hands." Tr. 603 (associated headache pain is not referenced). Dr. Tomarchio ordered a cervical spine epidural spine injection in June 2021; it was administered on July 7, 2021. Tr. 600, 606. On July 12, 2021, Plaintiff reported "some relief" from the injection; however, he indicated he was "still in pain and seem[ed] to be having muscle spasms." Tr. 599. Notes from an August 4, 2021 follow-up visit, indicated Plaintiff had "[n]eck pain with frequent migraines." Tr. 594. In November 2021 Plaintiff reported to Walter Schuyler, M.D. (also of the pain management practice) that a recent lumbar steroidal injection had provided 50% pain-relief. Tr. 578. Plaintiff's assessments included cervical radicular pain and "headache, unspecified." Notes indicate Plaintiff was "still having diffuse head pain." Tr. 579.

            3.    Record evidence from Palmetto Primary and Specialty Care Physicians

The evidence discussed by the ALJ in finding headaches to be a nonsevere impairment at Step Two are from Plaintiff's visits to Palmetto Primary and Specialty Care Physicians. On February 26, 2021, Plaintiff saw that group's Catherine Woods, DNP for headaches. Tr. 698 ("Reason for Appointment 1. Headache"). In treatment notes Plaintiff reported having had headaches since his 2018 neck surgery;[7] he noted no recent worsening or increase in frequency or severity. Tr. 698. Plaintiff indicated the headaches would "start at base of skull and neck, radiate forward, pressure behind eyes." Tr. 698. He reported "no nausea, photophobia, phonophobia, no smell sensitivity, irritability." Tr. 698. He said the headaches would last "all day intermittently." Tr. 698. Plaintiff indicated neck pain and weather changes made the headaches worse. He takes Aleve, but it does not help. He does not have other medications for it. Plaintiff indicated he would

---

[6] Dr. Tomarchio's notes do not reference the cervical MRI taken March 15, 2021, as ordered by Caterine Woods, DNP, of Palmetto Primary and Specialty Care Physicians. *See* Tr. 712-13 (as discussed, *infra*).
[7] As the Commissioner points out in his brief, Plaintiff's neck surgery took place in 2019.

have a headache three-to-four times per week. Tr. 698. Plaintiff also noted he had issues sleeping through the night. He said he had both blurry and double vision with his headaches. Tr. 698. NP Woods assessed Plaintiff with cervicalgia, cervical spinal cord compression, and "[i]ntractable migraine without aura and without status migrainosus." Tr. 700. Because Plaintiff's headaches had "originated since the time of surgery" but also progressed, NP Woods ordered an MRI to evaluate for worsening cervical cord compression. Regarding the "intractable migraine," NP Woods prescribed nortriptyline HcL Capsule to be taken at bedtime and sumatriptan succinate tablet to be taken as needed at start of headache. Tr. 700.

Plaintiff returned to NP Woods on April 9, 2021 for "follow-up on persistent headaches and paresthesias with weakness." Tr. 694. Plaintiff reported the venlafaxine caused side effects; the sumatriptan helped but he had to repeat it and it caused drowsiness. Tr. 694. Plaintiff indicated continued "neck pain and subsequent headaches." Tr. 694.[8] Plaintiff again was assessed with cervicalgia, cervical spinal cord compression, "[i]ntractable migraine without aura and without status migrainosus," and also assessed with paresthesia. Tr. 696. NP Woods changed Plaintiff's headache-related medications, moving from venlafaxine to Depakote. He was to discontinue Sumatriptan, begin Rizatriptan as needed, and take Divalproex every day. Tr. 696. NP Woods indicated she would "closely review the MRI image with Dr. Lucas, to determine if the change from surgery warrants reevaluation by neurosurgery." Tr. 696.

On June 28, 2021 Plaintiff returned to Palmetto Primary and Specialty Care Physicians for a follow-up visit—this time he saw John H. Lucas IV, MD. Tr. 690. Dr. Lucas met with Plaintiff and reviewed his EMG nerve conduction studies. Tr. 691. Plaintiff conveyed he had been experiencing neck pain and headaches since his C5-C7 cervical fusion surgery. Plaintiff advised

---

[8] Other notations from the April 9, 2021 visit relate to issues with his hands, muscle twitching in his left forearm, and pain in his lower back and hip. Tr. 694.

his pain management visits were not helping him at all. Tr. 691. Dr. Lucas indicated Plaintiff's most recent MRI indicated Plaintiff "now has disc degeneration with an osteophyte at C4-5 touching against the cord." Tr. 691. Dr. Lucas indicated that Plaintiff "was given Depakote for his headaches but they are really not migraines is simply having cervicogenic headache." Tr. 691. Dr. Lucas' assessments included cervical disc disorder at C4-C5 with myelopathy, cervicalgia, and paresthesia. Tr. 692. Dr. Lucas noted there had been "[n]o improvement in his paresthesia or headaches with Depakote Effexor or Cymbalta or amitriptyline." Tr. 691. Dr. Lucas referred Plaintiff to Charleston Neurosurgery Associates in relation to his cervical disc disorder. Tr. 691.[9]

4.    Discussion of allegation concerning consideration of headaches

Plaintiff complains that the ALJ erred in considering his headaches at Step Two, where she found Plaintiff's headaches to be a non-severe impairment. Plaintiff submits the ALJ should have considered them in assessing Plaintiff's RFC as the headaches were cervicogenic in nature, *i.e.*, they were symptomatic of his severe impairment of degenerative disc disease of the cervical spine. Pl. Mem. 12-15. Effectively, Plaintiff's argument is that the ALJ failed to consider the symptoms ascribable to his headaches in assessing his RFC.

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* (emphasis in original). At the administrative hearing level the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c), § 416.946(c). An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the

---

[9] The court is aware of no records from Charleston Neurosurgery Associates that post-date June 2021.

physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3)-(4), § 416.945(a)(3)-(4).

The Administration's policy interpretation on assessing an individual's RFC emphasizes that the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1. The functions identified in the cited regulations include physical abilities, mental abilities, and other abilities affected by impairments. 20 C.F.R. § 404.1545(b)-(d); § 416.945(b)-(d).

As argued by the Commissioner however, Plaintiff's argument concerning consideration of his headaches is flawed in that the record includes no evidence that his headaches (whether nominated migraines or cervicogenic in nature) actually limited his ability to perform work-related functions. Def. Mem. 9-12.

In her Step Two analysis the ALJ noted Plaintiff's records did not reveal functional limitations attributable to headaches. Tr. 18. Plaintiff's argument that medical diagnoses of the cause of headaches is not needed is well-taken. Pl. Mem. 12-13. However, even though there often will not be "objective" evidence of headaches, *see Cox v. Saul*, No. 4:19-CV-02717-TER, 2021 WL 973345, at *5 (D.S.C. Mar. 16, 2021) (remanding based on ALJ's improper reliance on lack of objective evidence as to plaintiff's headaches, *inter alia*), that misses the point here.

No separate objective medical testing is required in the consideration of headaches. Rather, as pointed out by Plaintiff, in this case, the ALJ needed to consider the *symptoms* set out by Plaintiff that were attributable to his cervical degenerative disc disease. Pl. Mem. 9-14. Here, the ALJ did just that. *See* Tr. 19-20. Nowhere in the record does a provider or Plaintiff himself actually attribute

18

a specific functional impairment to his headaches. Importantly, in his testimony, Plaintiff did not

explain how his headaches impacted his ability to work. Reviewed in full, Plaintiff's hearing

testimony regarding headaches follows:

> ALJ: [P]lease tell me in your own words why you believe you're disabled and not
> able to work?
> Pl.: Because I have migraines between, I guess seven days out of the week, I have
> them between four, four times out the week. I have a lower back problem; I have a
> neck problem, hip replacement problem; I can't stand more than between 15 and
> 30 minutes; I'm on some heavy medication; I don't sleep more than three hours
> during the day.
>
>        * * *
>
> ALJ: [H]ave you had surgery on your neck?
> Pl.: Yes, ma'am.
> ALJ: And since that surgery, how's your neck doing?
> Pl. Still in pain and it's causing migraines and so we trying to figure out why the
> migraines, that's where I'm getting the migraines from is from the neck surgery
> and the right side of my face is numb.

Tr. 37, 39. Other than including headaches as a reason he is disabled, Plaintiff offers no information

as to how the headaches disable him. Of course whether Plaintiff is disabled is a matter left for the

Commissioner to decide. *Pace v. Saul*, No. 619CV01186DCNKFM, 2020 WL 6111000, at *6

(D.S.C. Oct. 16, 2020) (citing 20 C.F.R. § 404.1527(d) and noting issues of whether a claimant is

"disabled" is reserved for the Commissioner), *aff'd sub nom. Pace v. Kijakazi*, No. 20-2337, 2022

WL 3334628 (4th Cir. Aug. 12, 2022). Plaintiff has, at best, explained the headaches are the result

of issues with his neck/cervical spine. Although he has indicated how *often* he has the headaches,

his testimony about frequency without discussion of how the headaches actually impact his ability

to function is insufficient for Plaintiff to satisfy his burden. *See Bowen v. Yuckert*, 482 U.S. at 146

n.5 (noting claimant bears burden of proof at steps one to four, including the determination of the

RFC).

Evidence supports the ALJ's findings that the treatment record, Plaintiff's subjective

reporting, and Dr. Tomarchio's and Dr. Lucas's evaluation of Plaintiff's reported headaches were

not a severe impairment and were cervicogenic headaches. Tr. 18. *See Biestek*, 139 S. Ct. at 1154. The ALJ did not "dismiss" Plaintiff headaches; she evaluated them against the contents of the record and, like two treating doctors did, determined they were cervicogenic headaches. Tr. 18. Here, the ALJ found Plaintiff's cervical impairment severe and continued to evaluate it and the pain it caused throughout the decision. Tr. 18-22.

Plaintiff argues the ALJ erred in that he "did not refute that [Plaintiff] suffered from cervicogenic headaches" and "did not refute the evidence establishing [his] headache last all day intermittently and occur three to four times per week." Pl. Mem. 17 (citing to Tr. 690, 694, 698, which are early 2021 visits to Palmetto Primary and Specialty Care Physicians regarding headaches). Plaintiff cites to *Abstance v. Kijakazi*, in support of his argument. In that case, the ALJ's analysis of Plaintiff's claimed headaches was found to be lacking when the ALJ did not take into account very specific testimony from Plaintiff that had described how she would "have to stay in a dark room, no sound, no noise" when she experienced such a headache (in her case, a migraine headache). *Abstance v. Kijakazi*, No. CV 5:21-4104-KDW, 2023 WL 1879279, at *9 (D.S.C. Feb. 9, 2023). *See also Cox v. Saul*, 2021 WL 973345. In *Cox*, another case cited by Plaintiff, the court determined the ALJ had erred by looking to objective evidence of headaches/migraines and by failing to consider the claimant's testimony of how Plaintiff's headaches impacted him on a day-to-day basis in establishing his RFC. In *Cox*, the record included testimony that his headaches occurred "at least once a week and lasted 3-6 hours." *Id.* at *4. Importantly, the record included not only evidence of the frequency and duration of the headaches, but it also included evidence that claimant reported "he could not perform normal activities and was incapacitated" when experiencing them. *Id.*

Here, however, Plaintiff has offered no evidence or testimony regarding how his headaches impact his abilities to function.[10] His discussion of headaches in various medical records describe where he feels them and the frequency he typically experiences them. Those notes generally indicate Plaintiff had blurry and double vision when experiencing the headaches. Although less clear, a reading of the notes could indicate he also experiences photophobia, phonophobia, and irritability when experiencing the headaches. *E.g.*, Tr. 690, 694, 698 ("no nausea, photophobia, phonophobia, no smell sensitivity, irritability").[11] At the hearing, Plaintiff again indicated how often he experienced the headaches. Tr. 37 (indicating he experienced "migraines" four times per week). Nowhere does Plaintiff (or any medical professional) discuss what sort of impact, if any, the headaches had on his ability to perform work-related functions. This is so even accepting that the notes from Palmetto Primary and Specialty Care Physicians indicate Plaintiff experienced vision issues, irritability, and sensitivity to light and sound. Neither Plaintiff nor any medical professional discussed how these symptoms impacted Plaintiff's ability to perform work-related functions. Citing a recent Fourth Circuit opinion Plaintiff argues the evidence before the ALJ here "suggests that [Plaintiff's] 'abilities fluctuate during' a headache." Pl. Mem. 17 (quoting *Rogers v. Kijakazi*, 62 F.4th 872, 880 (4th Cir. 2023)). That case is inapposite here, however. The claimant in *Rogers* presented evidence that her abilities fluctuated during her monthly menstrual cycle, including record evidence that had been before the ALJ concerning how claimant's mental

---

[10] The Commissioner's argument notes Plaintiff did not include any reference to headaches on his application, nor did he report the headaches to any provider until early 2021. Def. Mem. 9. On Reply, Plaintiff looks to this argument as encapsulating the Commissioner's argument that Plaintiff did not report any functional limitations as having been caused by headaches. Reply 1 (noting the Commissioner "offers zero authority for this restrictive reporting requirement"). The court notes, however, it is not the timing but the content of Plaintiff's discussion of headache that is the real focus here.

[11] This notation is not a model of clarity. A fair reading of it could also be that Plaintiff reported none of any of the listed symptoms.

conditions fluctuated dependent on her cycle. The court noted the ALJ had not mentioned that evidence at all and in no way addressed the potentially cyclic nature of her abilities. Here, however, the ALJ acknowledged the evidence related to Plaintiff's headaches. The record contained no evidence of *how* headaches could cause Plaintiff's abilities to fluctuate.

Here, the ALJ specified that the medical evidence in the record "from August 9, 2017 through December 31, 2017 supports a finding that the claimant's neck pain would limit him to a range of light work and his neck pain and vertigo symptoms necessitated postural and hazard limitations" as set forth in the RFC. Tr. 21. The ALJ explained, "[c]onsidering cervicogenic headaches and use of narcotics," Plaintiff was to "avoid concentrated exposure to hazards." Tr. 21. The record included no other specific information as to functional limitations attributable to Plaintiff's headaches that the ALJ neglected to address. Certainly, it may be that one with cervicogenic headaches could present credible evidence of functional limitations caused by the headaches. In such cases, it would be appropriate for the ALJ to consider and discuss that claimant's allegations of limitations the headaches caused. Here, however, the record lacks any specific information from Plaintiff as to how the headaches—regardless of what they are called—caused him to be unable to work or caused specific issues that should be taken into account in evaluating his RFC. *Cf. Freddie F. v. Kijakazi*, No. 22CV04013BHHMGB, 2023 WL 9065039, at *9 (D.S.C. Dec. 4, 2023) (recommending remand when ALJ did not consider plaintiff's specific testimony and record evidence that indicated the "disabling effects of [his] headaches [that] could render him disabled"), *report and recommendation adopted,* No. CV 2:22-4013-BHH, 2024 WL 38704 (D.S.C. Jan. 3, 2024). In that case, the plaintiff testified that approximately two-to-three times per week he experienced incapacitating headaches that required him to lie down and kept him from doing anything. The ALJ did not discuss the record evidence that spoke to such functional limitations in discounting plaintiff's headaches and in formulating the RFC. *Id.* Here,

the record includes no such evidence as to any potentially debilitating/disabling effects of Plaintiff's headaches. The ALJ did not err in her consideration of the headache-related evidence or in her RFC findings related to same.

At bottom, the court finds the ALJ appropriately considered the evidence related to Plaintiff's headaches and set out a limitation in the RFC based on Plaintiff's headaches and use of narcotic medication. She also appropriately considered the record evidence of how Plaintiff's ability to function was impacted by his severe impairment of cervical degenerative disc disease (and other impairments).

B.      Evaluation of Plaintiff's subjective symptomology

Plaintiff also ascribes error to the ALJ's evaluation of his symptomology and to her characterization of a May 2021 cervical MRI. Pl. Mem. 18-23. The Commissioner contends that substantial evidence supports the ALJ's consideration of Plaintiff's subjective complaints, including allegations of pain. Def. Mem. 12-15.

As noted by Plaintiff , SSR 16-3p provides a two-step process for evaluating an individual's symptoms. First, the ALJ must determine whether the individual has a medically determinable impairment "that could reasonably be expected to produce the individual's alleged symptoms, such as pain." SSR 16-3p, 2017 WL 5180304, at *3. In the second step the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . .." *Id.* Echoing the factors set out in 20 C.F.R. 404.1529(c)(3), SSR 16-3p lists factors to be considered in evaluating the "intensity, persistence, and limiting effects of an individual's symptoms[.]" *Id.* at *7. Those factors include the following:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7-8. SSR 16-3p indicates the ALJ will consider "only the factors that are relevant to assessing the intensity, persistence, and limiting effects of the individual's symptoms." *Id.* at *8.

        1.      The ALJ's findings

Here, the ALJ considered Plaintiff's subjective statements by using the two-step process outlined above. Tr. 19. At step one, the ALJ found Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms[.]" Tr. 19. The ALJ found, however, that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 19.

The ALJ began her in-depth discussion of Plaintiff's subjective statements and her findings as to Plaintiff's RFC by discussing Plaintiff's 2019 cervical issues, including a disc protrusion at C5-C6 and C6-C7, noting Plaintiff's arm pain improved after an August 1, 2019 anterior cervical discectomy and fusion surgery, and noting Plaintiff still had some neck stiffness and residual numbness in the left shoulder and arm, although his motor strength was 5/5 in both upper extremities. Tr. 19 (citing exs. B1F/3, 5 (Jan. 2019 x-rays: shoulder x-rays normal; cervical spine x-rays showing normal alignment but "[m]inimal disc height loss at C5-6 and C6-7; found at Tr. 332, 334); B12F/1-2 (June 2019 cervical spine MRI indicating degenerative changes; prominent disc protrusion at C5-6, less-prominent protrusion at C6-7 that also compresses thecal sac, found at Tr. 517-18); B2F (June 26, 2019 notes of George H. Khoury, M.D., who discusses MRI results

and possibility of surgery; August 2019 surgical records from Bon Secours St. Francis Hospital, found at Tr. 340-89); B4F/1, 3, 13 (Aug. 12, 2019 post-operative visit with Dr. Khoury, who indicates Plaintiff is having an "excellent recovery"; Plaintiff indicated he had no arm pain or numbness but had some pain in his neck; Dr. Khoury referred Plaintiff to physical therapy; September 23, 2019 post-operative visit with Brooke Jackson Kahn, PA-C: Plaintiff complains of occasional neck pain and tingling in both arms and fingers and right shoulder. He indicates physical therapy does not seem to be helping. PA Kahn notes Plaintiff's complaints of "some residual symptoms" but notes Plaintiff indicated that "overall his pain has significantly improved since surgery"; found at Tr. 418, 420, 430)).

The ALJ then discussed Plaintiff's pain treatment, noting he began treatment at a pain-management clinic in January 2020. Tr. 20 (citing B7F/4, notes from January 8, 2020 visit with John Tomarchio, M.D.; Plaintiff complains of pain in cervical spine, left hip, right wrist; Plaintiff indicates the pain is at a level of 6/10 and has gotten worse since the August 2019 surgery, Tr. 469; Dr. Tomarchio prescribed hydrocodone/acetaminophen tablets to take twice per day, as needed; B7F/4 is found at Tr. 472). The ALJ noted Plaintiff had been prescribed narcotics for pain and that he had reported the medications were 80-to-90 percent effective in treating his pain. The records indicated Plaintiff had denied having side effects. Tr. 20 (citing numerous treatment records from pain-management specialists).[12] The ALJ determined that "[t]his evidence of pain control with

---

[12] Review of the records cited reveals they all relate to Plaintiff's various appointments with pain-management doctors, Dr. Tomarchio and Dr. Schuyler. Although the reported pain level for the visits varied from 3/10 to 8/10, the details regarding pain control always indicated Plaintiff's pain was "80-90%" controlled with medication, Plaintiff had no reported side effects, and relief usually remained effective "4 to 5 hours." See Exs. B7F/8 (Feb. 19, 2020, Tr. 476); B7F/14 (March 25, 2020, Tr. 482); B15F/1 (Apr. 22, 2020, Tr. 541); B15F/8 (May 20, 2020, Tr. 548); B15F/15 (June 24, 2020, Tr. 555); B15F/25 (Aug. 19, 2020, Tr. 565); B16F/23 (Aug. 4, 2021, Tr. 593); B16F/32, July 6, 2021, Tr. 602); B16F/35 (June 8, 2021, Tr. 605); B16F/39 (May 11, 2021, Tr. 609); B16F/44 (Apr. 14, 2021, Tr. 614); B16F/47 (March 17, 2021, Tr. 617); B16F/54 (Feb. 17, 2021,

medications indicates that the claimant can perform a reduced range of light work in spite of his impairments." Tr. 20.

The ALJ then referenced Plaintiff's March 15, 2021 post-surgical MRI of his cervical spine. Tr. 20 (citing ex. B18F/23-24, found at Tr. 712-13). The ALJ characterized the March 2021 MRI as indicating "stable postsurgical changes and minimal degenerative joint disease" that "indicates that the claimant's degenerative disc disease has been improved with surgery with no sign of recurrence." Tr. 20.[13]

The ALJ then discusses the expert evidence, including that of the state-agency reviewing physicians, Dr. Christine Thompson and Dr. Katrina Doig. Tr. 20-21. Finally, the ALJ considered a prior administrative finding and explained why the current RFC is less restrictive in some regards. Tr. 21.

2.    Discussion

Plaintiff complains the ALJ did not include discussion of Plaintiff's ADLs or some of the other factors listed in SSR 16-3p. Pl. Mem. 15-23. As an initial matter, however, the undersigned notes that SSR 16-3p provides the list of factors that may be considered, but notes only those relevant to the analysis need be discussed. SSR 16-3p, 2017 WL 5180304, at *8 (indicating the ALJ will consider "only the factors that are relevant to assessing the intensity, persistence, and limiting effects of the individual's symptoms."). Nonetheless, the court agrees with Plaintiff that portions of the ALJ's analysis of subjective symptoms—in particular her characterization of the March 2021 cervical-spine MRI taken over a year-and-a-half after Plaintiff's August 2019 fusion

Tr. 624); B16F/62, Jan. 20, 2021, Tr.  632) B16F/68 (Nov. 18, 2020, Tr. 638); B16F/71 (Oct. 14, 2020, Tr. 641); B16F/78 (Sept. 16, 2020, Tr. 648).

[13] The ALJ also referenced Plaintiff's complaints of hip pain as well as hand issues that included carpal tunnel release surgery in the right hand. Tr. 20. Plaintiff's focus on appeal does not focus on this portion of the decision.

surgery and never considered by the state-agency physicians—do not allow the court to find the decision to be supported by substantial evidence.  As noted by Plaintiff, the ALJ's characterizes the March 2021 MRI as revealing "stable postsurgical chances and minimal degenerative joint disease" and as indicating Plaintiff's "cervical degenerative disease has been improved with surgery with no sign of recurrence." Tr. 20. Plaintiff submits the interpretation of his cervical DDD as being improved with no recurrence amounts to the ALJ's "playing doctor," something she cannot do. Pl. Mem. 21. "An ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so." *Washington v. Comm'r of Social Security*, 659 F. Supp. 2d 738, 749 (D.S.C. 2009) (citing *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007)).

The report concerning the MRI does not necessarily indicate Plaintiff's cervical spine was "stable" after the 2019 surgery. Consider Dr. Paul Kuperman's interpretation of the March 15, 2021 MRI, as compared with an MRI taken in June 19, 2019. Tr. 712-13. In August 2019 Plaintiff had cervical fusion at C5-6 and C6-7. Tr. 348. The MRI indicated "postsurgical changes [] without significant stenosis" at those levels. Tr. 712. In addition, however, at C4-5 the MRI provided the following: "Disc and osteophyte change encroaches upon but does not obliterate the anterior subarachnoid space. The foramina are patent." Tr. 712. The radiologist noted, "[t]his is new as compared to June 19, 2019." Tr. 712. On June 28, 2021, Plaintiff saw neurologist John H. Lucas IV, MD, with complaints of continued neck pain and headaches since his cervical surgery. Tr. 691-92. Dr. Lucas reviewed the March 2021 MRI and explained Plaintiff "now has disc degeneration with an osteophyte at C4-5 touching against the cord." Tr. 691. Dr. Lucas reported that EMG nerve conduction studies were normal in all extremities. Tr. 691. Dr. Lucas indicated there was no further

treatment he could offer; however, Dr. Lucas referred Plaintiff to a neurosurgeon with a note that Plaintiff potentially could benefit from a spinal stimulator. Tr. 692.[14]

     In responding to Plaintiff's allegations, the Commissioner never references the 2021 MRI in his brief. Instead, the Commissioner argues substantial evidence supports the ALJ's findings in part based on her discussion of the opinions of state-agency experts Christine Thompson, MD, and Katrina Doig, MD. Def. Mem. 13. The ALJ briefly characterized the opinions of Dr. Thompson and Dr. Doig as finding Plaintiff had the RFC to "perform a reduced range of light work with postural limitations, manipulative limitations, and limited exposure to hazards." Tr. 20 (citing ex. B3A, B4A, found at Tr. 81-108). The ALJ further noted Dr. Doig provided "essentially the same opinion." Tr. 20-21 (citing ex. B8A, B9A, found at Tr. 112-41).

     As noted by Plaintiff, however, both agency experts had reviewed the records and offered their opinions in 2020, meaning they did not have the benefit of the 2021 MRI. In May 2020, Dr. Thompson reviewed the record and found Plaintiff could perform light work with postural, manipulative, and environmental limitations. Tr. 88-93. Dr. Thompson noted Plaintiff's symptoms of chronic pain had persisted "far beyond the surgeries to treat them and had not been relieved by conservative medical therapy, several rounds of [physical therapy], or surgical treatments. Tr. 92. Dr. Thompson opined physical exams and imaging provided no "physiological sources for his pain[.]" In September 2020, Dr. Doig reviewed the updated record and affirmed Dr. Thompson's RFC assessment. Tr. 120-25.

     The court finds the ALJ's self-assessment of the 2021 cervical MRI as being "stable" without referencing the finding of a new osteophyte at C4-5 or any medical discussion of same is impermissible evaluation of medical evidence. The two state-agency experts with whom the ALJ

---

[14] As noted above, there is no record of any follow-up visits to a neurosurgeon. This was not discussed at the hearing.

agreed as to Plaintiff's RFC did not have the benefit of the 2021 MRI in rendering their opinions. *See Fleming v. Astrue*, No. CIV.A. 5:11-304-DCN, 2012 WL 3686622, at *14 (D.S.C. July 10, 2012) (recommending remand as to evidence presented by plaintiff that post-dated the state agency's consideration), *report and recommendation adopted as modified,* No. 5:11-CV-00304-DCN, 2012 WL 3679628 (D.S.C. Aug. 24, 2012).

This matter is remanded for further consideration of the findings as set out in the 2021 MRI. As part of this analysis on remand, the ALJ should further evaluate Plaintiff's complaints of pain. While it is accurate that Plaintiff often reported his pain was 80-90% controlled by medication, he consistently reported that such relief lasted four-to-five hours. This could be problematic in that Plaintiff's prescriptions were for medications to be taken twice per day, or every 12 hours. *See, e.g.*, Tr. 485 (Mar. 25, 2020 note of Dr. Tomarchio, indicating Plaintiff has been prescribed (and is to continue taking) hydrocodone-acetaminophen tablet, 10-325 mg 1 tablet as needed BID [twice per day].[15] In addition, as noted by Plaintiff, the ALJ never considered the various other procedures Plaintiff had in an effort to control his pain. Tr. 546, 553 (May 2020 and June 2020 lumbar medial branch blocks); Tr. 559 (June 2020 lumbar medial branch nerve radiofrequency ablation in June 2020). Dr. Tomarchio's July 8, 2020 records indicate Plaintiff returned after the June 2020 ablation with complaints of increased pain. Tr. 561 (rating his lumbar spine pain as an 8/10, is constant, and nothing improves it). Plaintiff then received lumbar epidural spinal injections in September 2020, January 2021, and August 2021. Tr. 653, 630 591. Follow-up treatment notes indicate Plaintiff said the injections improved pain levels by 50 percent, and the improvement lasted "[a] few days." Tr. 585 (notes from Sept. 21, 2021 visit in follow up to the

---

[15] The court notes Plaintiff's hearing testimony in which he indicated he sometimes took his 10 mg oxycodone pain medication "every four, four to six hours," "between two, almost three about like four days out of the week." Tr. 38.

Aug. 31, 2021 lumbar epidural spinal injection), Tr. 588 (notes from Sept. 1, 2021 visit, in which

Plaintiff indicated the spinal injections on Sept. 9, 2021 and Jan. 21, 2021 had provided 80% relief

that had lasted for a few days; the July 7, 2021 cervical injection had given 60% relief that had

lasted a few days). Dr. Thompson and Dr. Doig were also not able to consider the injections in

September 2020, January 2021, or August 2021. *See* Tr. 653, 630, 591.[16]

That Plaintiff received epidural shots and blocks in an attempt to mitigate his pain does not

necessarily change his disability-status. However, one of the factors SSR 16-3p sets out that may

be considered is whether a claimant is receiving pain-related treatments other than medication.

Based on the information included in the ALJ's decision, the court cannot determine that

her evaluation of Plaintiff's symptoms is supported by substantial evidence. The ALJ's

characterization of findings in Plaintiff's March 2021 cervical MRI as indicative of Plaintiff's

condition having improved after surgery and being stable overlook the new condition found in that

MRI. Whether that new finding would impact Plaintiff's pain and his RFC is not for the ALJ to

determine on her own. *See Lee v. Saul*, No. 7:20-CV-11-RJ, 2021 WL 259446, at *6 (E.D.N.C.

Jan. 26, 2021) (remanding for further consideration of cervical spine CT results, noting that

"[w]hile the ALJ characterized these findings as non-severe abnormalities, the basis for that

assessment is not apparent, and the ALJ is not a doctor. *See Rohan v. Chater*, 98 F.3d 966, 970

(7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own

independent medical findings.").") Remand is appropriate.

---

[16] Dr. Thompson's March 2020 opinion includes notations by Coastal Plains Physicians Associates concerning a March 2020 "injection of [left] hip bursa." Tr. 86; *see* Tr. 464. Dr. Thompson also references a March 25, 2020 record from Dr. Tomarchio indicating a plan for a "diagnostic Lumbar Medial Branch Block." Tr. 87; *see* Tr. 485 (March 25, 2020 Dr. Tomarchio notation noting plans to perform a diagnostic lumbar medial branch block and to continue with such blocks if Plaintiff receives pain relief from injection). Dr. Doig lists these same notes. Tr. 122.

On remand, the Commissioner should also consider whether the findings in the March 2021 cervical MRI could relate to Plaintiff's continued complaints of cervicogenic headaches and their associated pain. As noted above, Plaintiff's allegation of error concerning the ALJ's treatment of his headache complaints themselves was, in and of itself, insufficient to require remand because Plaintiff never attributed specific functional limitations to his headaches. Nonetheless, on remand, the Commissioner should consider the import of the new findings in the March 2021 MRI, obtaining medical counsel as appropriate. Such reconsideration is required as the ALJ's current evaluation of Plaintiff's symptomology is not supported by substantial evidence. *See Fleming v. Astrue*, 2012 WL 3686622, at *14 (D.S.C. July 10, 2012) (recommending remand as to evidence presented by plaintiff that post-dated the state agency's consideration), *report and recommendation adopted as modified,* 2012 WL 3679628 (D.S.C. Aug. 24, 2012).

IV.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine if the Commissioner's decision is supported by substantial evidence. The court hereby reverses the decision of the Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g) and remands the matter to the Commissioner for further proceedings consistent with this Order.

IT IS SO ORDERED.

February 13, 2024                                    Kaymani D. West
Florence, South Carolina                            United States Magistrate Judge